JUDGE PAULEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION, VIRGINIA M. ROMETTY, MARTIN J. SCHROETER and JAMES J. KAVANAUGH,<br><br>Defendants. | Civil Action No. 15 CV 1513<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

RECEIVED
MAR 02 2015
U.S.D.C. S.D.N.Y.

Plaintiff makes the following allegations based upon the investigation undertaken by plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by International Business Machines Corporation ("IBM" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of purchasers of IBM common stock between April 17, 2014 and October 17, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Defendant IBM is a multinational technology and consulting corporation that manufactures and markets computer hardware and software products and provides its customers with various information technology ("IT") related services. IBM's System and Technology business segment, which sells mainframes, servers, storage and other hardware devices, was once a strong cash generator for the Company. Recently, however, IBM has been unable to sustain the segment's growth as its hardware devices have been subject to quick commoditization. As a result, IBM's System and Technology business segment, which generated 25% of the Company's revenues during 2006, accounted for only 14% of IBM's revenues in 2013.

3. During the past several years, IBM initiated a strategy to systematically divest its less profitable, capital intensive hardware businesses so that the Company could focus its efforts on selling high margin services. To that end, in January 2014, Lenovo Group Ltd., the world's largest personal computer vendor by unit sales, with headquarters in Beijing, China, agreed to purchase

IBM's x86 server division for $2.3 billion. In addition, since at least 2013, IBM has sought a buyer for its micro-chip manufacturing operations, its so-called Microelectronics business.

4. During the Class Period, defendants fraudulently misrepresented the true value of IBM's Microelectronics business by disseminating materially false and misleading financial statements that failed to record an impairment in the value of the Company's Microelectronics business in conformity with applicable accounting standards. Defendants' fraudulent conduct materially inflated IBM's earnings during the Class Period and rendered the Company's 2014 earnings guidance materially false and misleading.

## JURISDICTION AND VENUE

5. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

7. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

8. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange located in this District.

## PARTIES

9. Plaintiff City of Sterling Heights Police & Fire Retirement System, as set forth in the accompanying certification and incorporated by reference herein, purchased IBM common stock during the Class Period and has been damaged thereby.

10. Defendant IBM provides information technology products and services worldwide. Headquartered in Armonk, New York, defendant IBM had more than 989.6 million common shares outstanding as of September 30, 2014. The Company's common stock is listed and trades on the NYSE under the ticker symbol "IBM."

11. Defendant Virginia M. Rometty ("Rometty") is, and was at all relevant times, the President, Chief Executive Officer ("CEO"), a director and the Chairman of the Board of IBM.

12. Defendant Martin J. Schroeter ("Schroeter") is, and was at all relevant times, Senior Vice President and Chief Financial Officer ("CFO"), Finance and Enterprise Transformation at IBM.

13. Defendant James J. Kavanaugh ("Kavanaugh") is, and was at all relevant times, Vice President and Controller of IBM. Defendant Kavanaugh signed IBM's Form 10-Qs filed with the SEC during the Class Period.

14. Defendants Rometty, Schroeter and Kavanaugh are collectively referred to herein as the "Individual Defendants."

15. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of IBM, were privy to confidential and proprietary information concerning IBM, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning IBM, as discussed in detail below. Because of their positions with IBM, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

16. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of IBM's business.

17. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

18. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to IBM's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future

business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of IBM common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of IBM common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding IBM's business, operations and management and the intrinsic value of IBM common stock; (ii) allowed certain of the Individual Defendants and other Company insiders to collectively sell their personally held IBM common stock for proceeds in excess of $23 million; and (iii) caused plaintiff and members of the Class to purchase IBM common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of IBM between April 17, 2014 and October 17, 2014, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IBM common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in

the proposed Class. Record owners and other members of the Class may be identified from records maintained by IBM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

23. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

24. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of IBM;

(c) whether the price of IBM common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

25. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Background**

26. Defendant IBM is a multinational IT company that manufactures and markets hardware and software products and offers infrastructure, hosting and consulting services in areas ranging from mainframe computers to nanotechnology.

27. IBM operates its business via five business segments: (i) Global Technology Services, (ii) Global Business Services, (iii) Software, (iv) Systems and Technology, and (v) Global Financing.

28. Global Technology Services primarily provides clients with IT infrastructure and business process services; Global Business Services provides clients Consulting and Application Management services; Software consists primarily of middleware and operating systems software; Systems and Technology provides clients with business solutions requiring advanced computing power and storage capabilities; and Global Financing facilitates the acquisition IBM systems, software and services by providing clients with necessary financing.

29. IBM's System and Technology business, which sells mainframes, servers, storage and other hardware devices, was once a strong cash generator for the Company. Recently, however, IBM has been unable to sustain the segment's growth as its hardware devices have been subject to quick commoditization. As a result, IBM's System and Technology business segment, which generated 25% of the Company's revenues during 2006, accounted for only 14% of IBM's revenues in 2013.

30. This action primarily concerns IBM's micro-chip manufacturing operations, which the Company refers to as its Microelectronics business. Microelectronics was part of IBM's Systems

and Technology segment and engaged in semiconductor design and manufacturing, primarily for use in IBM systems and storage products. Microelectronics incorporated two major fabrication facilities – a newer 300mm production facility in East Fishkill, New York, and an older production complex in Burlington, Vermont.

31. During the past several years, IBM has begun to systematically divest its less profitable, capital intensive hardware businesses and has begun focusing its efforts on selling high margin services.

32. In 2007, IBM's former CEO, Sam Palmisano, promised to deliver IBM earnings of at least $10 a share by 2010. The Company handily beat that number, delivering earnings per share ("EPS") of $11.52. IBM was able to achieve its objectives by ditching businesses that did not grow and by betting big on analytics and doubling down on software and services.

33. In May 2010, IBM made another promise about its future earnings and published a report outlining its "2015 Roadmap," which set a pledge for IBM to reach adjusted profits per share (a non-GAAP figure) of $20 by 2015. The 2015 Roadmap accelerated IBM's previously successful model by, as Sam Palmisano stated, "not chas[ing] things that are commoditizing," but rather, by focusing on IBM's analytics and its software and services businesses.

34. Defendant Rometty inherited and sustained the pledge to transition IBM from a hardware company to an IT services focused company when she succeeded Palmisano in 2012. According to IBM's 2013 annual report, since 2010, the Company had spent $7 billion on 17 cloud acquisitions and planned to spend an additional $3.2 billion to expand its footprint in the data center and cloud space. During 2013, IBM acquired Softlayer, a dedicated server managed hosting and cloud service provider, for $2 billion.

35. In addition, IBM continued to jettison less profitable, capital intensive hardware businesses. To that end, in January 2014, Lenovo Group Ltd. agreed to purchase IBM's x86 server division for $2.3 billion.

36. Meanwhile, during 2013, IBM sought a buyer for its money-losing Microelectronics chip-making business. *Bloomberg*, citing unnamed sources, reported in 2014 that IBM's Microelectronics business had been losing upwards of $1.5 billion per year.

37. Saddled with losses, IBM was having difficulty attracting a buyer for its micro-chip manufacturing operations. So in 2014, IBM hired Goldman Sachs Group, Inc. ("Goldman Sachs") to seek potential buyers for its Microelectronics business.

38. On April 3, 2014, a *Wall Street Journal* article (the "April WSJ article") reported that IBM had held talks with various chip makers about the sale of its Microelectronics business, including Globalfoundries, Intel Corp. and Taiwan Semiconductor Manufacturing Co.

39. According to the April WSJ article, while Globalfoundries had emerged as the leading candidate to buy IBM's semiconductor-making operations, no deal was imminent given that any potential agreement would need to satisfy unresolved issues concerning control of intellectual property, the terms under which the ultimate buyer might continue to make chips for IBM computers, and most significantly, price.

40. Significantly, the April WSJ article reported that although IBM was asking for more than $2 billion for Microelectronics, bidders were unwilling to pay much more than $1 billion.

41. Under applicable accounting rules, an impairment loss is to be recognized when the carrying amount of a long-lived asset (or group of assets), such as the semiconductor fabrication facilities included within IBM's Microelectronics unit, is not recoverable and exceeds its fair value,

*i.e.*, the amount at which an asset could be sold in a current transaction between willing parties other than in a forced or liquidation sale.

42. Such assets must be reviewed for an impairment in value when facts and/or circumstances indicate that the carrying value may be greater than the sum of the undiscounted cash flows expected from the asset's (or group of assets) use and disposal. Pursuant to applicable accounting rules, and the regulations established by the Sarbanes-Oxley Act of 2002, IBM was responsible for routinely assessing whether impairment indicators were present and was required to have systems or processes to assist in the identification of potential impairment indicators.

43. The events and circumstances associated with IBM's attempted sale of Microelectronics during 2013 and the first quarter of 2014 put defendants on notice that the carrying value of the Company's long-lived assets associated therewith were impaired no later than March 31, 2014.

44. During the Class Period, IBM reported an approximate $2.4 billion carrying value for the Microelectronics long-lived, property, plant and equipment assets in the financial statements it filed with the SEC and issued to investors, even though potential bidders were unwilling to pay much more than $1 billion for the entirety of the Microelectronics business operations. Upon information and belief, defendants knew or recklessly ignored that Microelectronics' long-lived related assets were ***completely worthless*** at March 31, 2013, as potential bidders were willing to pay $1 billion for Microelectronics primarily to acquire the engineers and intellectual property associated therewith and were willing to pay little, if anything, for its long-lived, property, plant and equipment assets.

45. Accordingly, defendants' representations in IBM's financial statements and about IBM's operating performance and earnings guidance during the Class Period, were both objectively false and could not have been believed by them at the time they were made.

46. In violation of applicable accounting standards, SEC rules and regulations and, indeed, IBM's own publicly stated accounting policies, defendants caused IBM to mask an impairment in the value of its Microelectronics long-lived assets during the Class Period. In doing so, IBM's reported earnings and its 2014 earnings guidance during the Class Period were each materially inflated and materially false and misleading.

47. Indeed, defendants were motivated to engage in their improper course to conduct to facilitate the sale of IBM's money-losing, capital intensive semiconductor operations.

48. In early July 2014, the negotiations between IBM and Globalfoundries broke down over price. Globalfoundries was then demanding that IBM ***pay it*** $2 billion to take over IBM's semiconductor unit, enough to offset the division's losses.

49. Three months later, in October 2014, IBM and Globalfoundries issued a press release jointly announcing that Globalfoundries would "acquire" IBM's Microelectronics business, including its existing long-lived semiconductor manufacturing assets and operations in East Fishkill, New York, and Essex Junction, Vermont. Associated therewith, IBM ***agreed to pay Globalfoundries $1.5 billion in cash*** and recorded a $2.4 billion impairment charge related to the write-off of ***the entire*** value that IBM reported for its Microelectronics' long-lived, property, plant and equipment assets during the Class Period.

**Materially False and Misleading Statements
Issued During the Class Period**

50. The Class Period starts on April 17, 2014. After the close of trading on April 16, 2014, IBM issued a press release announcing its financial results for its 2014 first quarter, the period

ended March 31, 2014. For the 2014 first quarter, the Company reported diluted earnings of $2.29 per share and operating (non-GAAP) diluted earnings of $2.54 per share. Defendant Rometty commented on the results, stating, in pertinent part, as follows:

> "In the first quarter, we continued to take actions to transform parts of the business and to shift aggressively to our strategic growth areas including cloud, big data analytics, social, mobile and security . . . .
>
> "As we move through 2014, we will begin to see the benefits from these actions. Over the long term, they will position us to drive growth and higher value for our clients."

51. Following the earnings announcement, IBM held a conference call with analysts and investors to discuss its earnings and operations. With respect to the earnings guidance for 2014, defendant Schroeter, stated, in pertinent part, as follows:

> For the year, we expect to deliver at least $18 of operating earnings per share for 2014. This does not include any gain from the sale of our System x business to Lenovo because of the uncertainty of the timing and amount, but it will ultimately be included in our operating EPS results, and we'll update you later in the year.
>
> Like always, we manage our business and allocate capital for the long term, and along the way, we still expect to deliver at least $20 of operating EPS in 2015.
>
> *　　*　　*
>
> In terms of the $18, we said that we would get to at least $18. We said in the first quarter that we would do about 14% of that, and that's where we came in, at 14%.
>
> *　　*　　*
>
> Given that quarterly phenomenon, a charge in the first quarter of this year but none the second versus the prior, we would think that the first half . . . is going to look a lot like last year, and we'll probably get about 38% of our full year EPS done by the end of the first half.
>
> And then when we look at the second half, we'll see consistent growth with what we need on a full year basis at 10.5, and given the transactional nature and the momentum in some of our businesses, we would say it would probably be a little bit faster in the fourth than in the third.

52. On April 29, 2014, IBM filed its Form 10-Q for the quarter ended March 30, 2014 with the SEC, signed by defendant Kavanaugh (the "First Quarter 10-Q"). The First Quarter 10-Q contained financial statements which represented, among other things, that:

> The accompanying Consolidated Financial Statements and footnotes of the International Business Machines Corporation (IBM or the company) have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP).
>
> * * *
>
> Non-financial assets such as property, plant and equipment, land, goodwill and intangible assets are also subject to nonrecurring fair value measurements if they are deemed to be impaired. The impairment models used for nonfinancial assets depend on the type of asset. See Note A, "Significant Accounting Policies - Impairment," on page 88 in the company's 2013 Annual Report for additional information. There were no material impairments of non-financial assets for the three months ended March 31, 2014 and 2013, respectively.

53. The First Quarter 10-Q contained representations about the operations of IBM's Systems and Technology segment, its management's discussion and analysis, its disclosure controls and internal controls over financial reporting and certifications thereon by defendants Rometty and Schroeter. The First Quarter 10-Q stated in pertinent part as follows:

| (Dollars in millions)<br>For the three months ended March 31: | | 2014 | | 2013 | Margin Change |
|---|---|---|---|---|---|
| Systems and Technology: | | | | | |
| External gross profit | $ | 645 | $ | 1,003 | (35.7) % |
| External gross profit margin | | 27.0 % | | 32.3 % | (5.3) pts. |
| Pre-tax income | $ | (660) | $ | (405) | (63.1) % |
| Pre-tax margin | | (25.8) % | | (12.5) % | (13.2) pts. |

Systems and Technology's gross profit margin decreased 5.3 points in the first quarter of 2014 versus the prior year. The decrease was driven by a decline due to revenue mix as a result of less mainframe content (2.3 points), lower margins in Power Systems (1.7 points), Microelectronics (1.3 points) and Storage (0.9 points), partially offset by higher margins in System z (0.2 points) and System x (0.1 points).

Systems and Technology's pre-tax loss increased $255 million to a loss of $660 million in the first quarter 2014, when compared to the prior year. Pre-tax margin decreased 13.2 points in the first quarter versus the prior year period. Normalized for workforce rebalancing charges of $218 million and $3 million in the first quarter of 2014 and 2013, respectively, Systems and Technology's first quarter pre-tax income was a loss of $442 million compared to a loss of $402 million in the prior year, and the pre-tax margin declined 4.8 points.

* * *

> The company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the company's disclosure controls and procedures were effective as of the end of the period covered by this report. There has been no change in the

company's internal control over financial reporting that occurred during the quarter covered by this report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

* * *

I, [defendants Rometty and Schroeter], certify that:

1. I have reviewed this quarterly report on Form 10-Q of International Business Machines Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has

> materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):
>
> a. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

54. The above representations concerning the Company's disclosure and internal controls were repeated, in all material respects, and certified by defendants Rometty and Schroeter, in the Form 10-Q for the quarter ended June 30, 2014 ("Second Quarter 10-Q") that IBM filed with the SEC on July 29, 2014.

55. On July 17, 2014, IBM issued a press release announcing its financial results for its 2014 second quarter, the period ended June 30, 2014. For the 2014 second quarter, the Company reported diluted earnings of $4.12 per share and operating (non-GAAP) diluted earnings of $4.32 per share. Defendant Rometty commented on the results, stating, in pertinent part, as follows:

> "In the second quarter, we made further progress on our transformation. We performed well in our strategic imperatives around cloud, big data and analytics, security and mobile . . . . We will continue to extend and leverage our unique strengths to address the emerging trends in enterprise IT and transform our business, positioning ourselves for growth over the long term."

56. Following the earnings release, IBM held a conference call with analysts and investors to discuss its earnings and operations. During the conference call, defendant Schroeter made statements about the Company's earnings and outlook, stating, in pertinent part, as follows:

> Let me spend a minute on the first-half performance. The revenue performance for the half is very similar to the second quarter. Through six months

> we had double-digit revenue growth in strategic initiatives, stable performance in our core franchises, and the impact of some secular trends in parts of hardware and from the divested business.
>
> Looking at profit, we expanded gross margin 50 basis points, pre-tax margin by 70 basis points, and net margin by 50 basis points. All while shifting investment to key areas. Operating earnings per share for the first half were up 9.5%.
>
> * * *
>
> Systems and Technology revenue of $3.3 billion was down 11%. This is a significant improvement in the year-to-year performance compared to last quarter. The improvement was driven by system z, as well as sequential improvements in system x and storage. This, together with actions to align our structure to the demand profile, result[ed in] progress in stabilizing our profit.

57. During the conference call, defendant Schroeter provided IBM's 2014 earnings guidance, stating in pertinent part as follows:

> As we look to the full year of 2014, we expect to deliver at least $18 of operating earnings per share and we still expect to deliver at least $20 of operating earnings per share in 2015. These are points along the way to delivering performance, and shareholder value over the long term.
>
> * * *
>
> In the second half, we see . . . our software revenue growth accelerating to mid-single digit. And we see our services profit growth of mid-single digit driven by productivity in the base. And then on STG . . . , we see that profit stabilization still. So when I think about the second half, and how that plays out, as we said 90 days ago, . . . I think EPS growth in the second half will be a little bit faster in the fourth than in the third. So kind of double-digit fourth quarter EPS and a single-digit third quarter EPS.
>
> And bear in mind that single-digit EPS growth even in the third, because of seasonality kind of translates to, no more absolute EPS than what we got in the second.

58. On July 29, 2014, IBM filed the Second Quarter 10-Q, signed by defendant Kavanaugh. The Second Quarter 10-Q contained financial statements which represented, among other things, that:

> The accompanying Consolidated Financial Statements and footnotes of the International Business Machines Corporation (IBM or the company) have been

prepared in accordance with accounting principles generally accepted in the United States of America (GAAP).

* * *

Non-financial assets such as property, plant and equipment, land, goodwill and intangible assets are also subject to nonrecurring fair value measurements if they are deemed to be impaired. The impairment models used for nonfinancial assets depend on the type of asset. See Note A, "Significant Accounting Policies - Impairment," on page 88 in the company's 2013 Annual Report for additional information. There were no material impairments of non-financial assets for the six months ended June 30, 2014 and 2013, respectively.

59. The Second Quarter 10-Q also contained representations about IBM's Systems and Technology segment and its management's discussion and analysis, stating, in pertinent part as follows:

| (Dollars in millions) For the six months ended June 30: | 2014 | 2013 | Margin Change |
|---|---|---|---|
| System and Technology: | | | |
| External gross profit | $ 1,773 | $ 2,382 | (25.6) % |
| External gross profit margin | 31.0 % | 34.7 % | (3.7) pts. |
| Pre-tax income | $ (635) | $ (546) | 16.3 % |
| Pre-tax margin | (10.4) % | (7.7) % | (2.8) pts. |

Systems and Technology's gross profit margin decreased 2.8 points in the second quarter of 2014 versus the prior year. The decrease was driven by lower margins in Power Systems (1.1 points), Storage (0.9 points), Microelectronics (0.8 points) and System x (0.8 points), partially offset by an improvement due to revenue mix (0.4 points). Gross profit margin for the first six months of 2014 decreased 3.7 points compared to the first six months of 2013. The decrease was driven by lower margins in Power Systems (1.3 points), Microelectronics (1.0 points) and Storage (0.9 points), and a decline due to revenue mix (0.7 points).

Systems and Technology's pre-tax income increased $166 million to $25 million in the second quarter and its pre-tax loss increased $89 million to $635 million for the first six months of 2014 compared to prior year periods. Pre-tax margin increased 4.3 points in the second quarter and decreased 2.8 points in the first six months versus the prior year periods. Second-quarter performance reflects a year-to-year reduction in workforce rebalancing charges of $202 million.

The company's focus for STG in 2014 is to stabilize the profit base and, after the first half of the year, the company is on track. The company will continue to make investments in this business to remain a leader in high-performance, high-end systems. In July, the company announced it will invest $3 billion over the next five years to tackle the challenges of the "post-silicon" era, demonstrating its commitment to innovation and to leading in the new era of enterprise IT.

60. The statements referenced above in ¶¶50-59 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

(a) that the Company's long-lived Microelectronics' assets were worthless;

(b) that the Company's operating results were materially inflated due to the improper failure to timely report a $2.4 million impairment in the value of Microelectronics' long-lived assets;

(c) that, based on (a) and (b) above, defendants lacked a reasonable basis for their representations that IBM was on track to achieve $18 in operating profits in 2014;

(d) that the Company's financial statements were presented in violation of GAAP and were materially false and misleading;

(e) that the Company's Forms 10-Q failed to disclose then-known events or uncertainties associated with IBM's Microelectronics business;

(f) that the Company's disclosure controls and internal controls over its financial reporting were materially deficient;

(g) that certifications issued by defendants Rometty and Schroeter associated with IBM's disclosure controls and internal controls over IBM's financial reporting were materially false and misleading; and

(h) that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company, its business prospects and future operating performance.

61. On October 20, 2014, before the opening of trading, IBM and Globalfoundries issued a press release jointly announcing that Globalfoundries would "acquire" IBM's semiconductor unit, including intellectual property rights, for a payment of $1.5 billion ***from IBM to Globalfoundries***, and that as part of the agreement, Globalfoundries would continue to supply semiconductors to IBM on an exclusive basis. The release disclosed that IBM would be taking a $4.7 billion charge to earnings on the semiconductor unit, stating in pertinent part as follows:

> IBM will reflect a pre-tax charge of $4.7 billion in its financial results for the third quarter of 2014, which includes an asset impairment, estimated costs to sell the IBM microelectronics business, and cash consideration to GLOBALFOUNDRIES. Cash consideration of $1.5 billion is expected to be paid to GLOBALFOUNDRIES by IBM over the next three years. The cash consideration will be adjusted by the amount of working capital which is estimated to be $200 million.

62. That same day, October 20, 2014, IBM issued a press release announcing its financial results for its 2014 third quarter, the period ended September 30, 2014. For the quarter, the Company reported sales of $22.4 billion on continuing operations (less the Microelectronics business), down 4% from the third quarter of 2013, and operating profits of $3.68 per share, down 10% from the third quarter of 2013. IBM reported that its gross profit margin from continuing operations on an operating basis was 49.2%, down 90 basis points from the third quarter of 2013. Total revenue from IBM's Systems and Technology segment, which includes semiconductor operations, declined 15%. The semiconductor unit alone recorded a $100 million loss in the quarter. The release issued that day quoted defendant Rometty stating in pertinent part that IBM was "'disappointed in [its] performance.'" Concerning the massive semiconductor unit charge to earnings, the release stated in pertinent part that:

> The loss from discontinued operations in the third quarter includes a non-recurring pre-tax charge of $4.7 billion, or $3.3 billion, net of tax. The charge includes an impairment to reflect fair value less estimated costs to sell the Microelectronics business assets, which the company has classified as held for sale at September 30, 2014. The charge also includes other estimated costs related to the transaction, including cash consideration expected to be transferred to GLOBALFOUNDRIES of approximately $1.5 billion. The cash consideration is expected to be paid to GLOBALFOUNDRIES over the next three years and will be adjusted by the amount of the working capital due by GLOBALFOUNDRIES to IBM, estimated to be $0.2 billion. In addition, discontinued operations includes operational net losses from the Microelectronics business of $0.1 billion in both the third quarter of 2014 and the third quarter of 2013.

63. Defendants updated IBM's 2014 guidance, now conceding that rather than the $18 per share promised in July 2014, operating EPS for 2014 would decline between 2% and 4% compared to $16.64 per share in 2013. Defendants also withdrew the 2015 Roadmap's $20 per share operating profit target.

64. As pointed out by *The Wall Street Journal* that day, IBM's bad results were company-specific, as IBM's "results stood in contrast to Apple Inc., which on Monday posted a 13%

profit increase on strong September sales of its larger-screen iPhones." Indeed, as *The Wall Street Journal DealBook's* Andrew Ross Sorkin eulogized, "[w]hile [IBM] spent $138 billion on its shares and dividend payments [since 2000], it spent just $59 billion on its own business through capital expenditures and $32 billion on acquisitions." Meanwhile, the Company's oft-repeated claim that it was still on track to achieve operating profits per share of $20 by 2015, buttressed by its massive stock buyback, concealed its consistently declining earnings and kept its stock price artificially inflated during the Class Period.

65. In response to these revelations, the price of IBM common stock, which had traded as high as $196.40 per share in intraday trading during the Class Period, plummeted more than $12 per share, from $182.05 per share on October 17, 2014 to close at $169.10 per share on October 20, 2014. The stock continued declining as the market absorbed the revelations, closing down at $163.23 per share on October 21, 2014 and $161.79 per share on October 22, 2014. In the end, the price of IBM stock declined approximately 18% from its Class Period high, erasing more than $35 billion in market capitalization.

66. On October 28, 2014, IBM filed its Form 10-Q for the quarter ended September 30, 2014 with the SEC, signed by defendant Kavanaugh (the "Third Quarter 10-Q"). The Third Quarter 10-Q represented that during the quarter IBM wrote off the entire value of Microelectronics' long-lived, property, plant and equipment assets. The Third Quarter 10-Q stated in pertinent part as follows:

> In the third quarter, the company recorded a pre-tax charge of $4.7 billion related to the sale of the Microelectronics disposal group, which was part of the Systems and Technology reportable segment. The pre-tax charge was recorded to reflect the fair value less the estimated cost of selling the disposal group including ***an impairment to the semiconductor long-lived assets of $2.4 billion***, $1.5 billion representing the cash consideration expected to be transferred to GLOBALFOUNDRIES and $0.8 billion of other related costs. The asset impairment was reflected in property, plant and equipment, net and the other costs of disposal

were reflected in other accrued expenses and liabilities and other liabilities in the Consolidated Statement of Financial Position at September 30, 2014.

* * *

Summarized financial information for discontinued operations is shown below

| (Dollars in millions) | Three Months Ended September 30, 2014 | Three Months Ended September 30, 2013 | Nine Months Ended September 30, 2014 | Nine Months Ended September 30, 2013 |
|---|---|---|---|---|
| Total revenue | $ 360 | $ 383 | $ 925 | $ 1,070 |
| Loss from discontinued operations, before tax | $ (141) | $ (159) | $ (520) | $ (580) |
| Loss on disposal, before tax | (4,697) | – | (4,697) | – |
| Total loss from discontinued operations, before income taxes | $ (4,838) | $ (159) | $ (5,217) | $ (580) |
| Provision/(benefit) for income taxes | (1,401) | (61) | (1,519) | (215) |
| Loss from discontinued operations, net of tax | $ (3,437) | $ (98) | $ (3,698) | $ (366) |

| (Dollars in millions) | At September 30, 2014 | At December 30, 2013 |
|---|---|---|
| Assets: | | |
| Accounts receivable | $ 208 | $ 166 |
| Inventory | 435 | 481 |
| Property, plant & equipment, net | 0 | 2,322 |
| Other assets | 103 | 90 |
| Total assets | $ 746 | $ 3,059 |
| Liabilities: | | |
| Accounts payable | $ 154 | $ 172 |
| Deferred income | 87 | 84 |
| Other liabilities | 163 | 20 |
| Total liabilities | $ 404 | $ 276 |

67. The market for IBM common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions of material fact, IBM common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased IBM common stock relying upon the integrity of the market price of IBM common stock and market information relating to IBM, and have been damaged thereby.

68. During the Class Period, defendants materially misled the investing public, thereby inflating the price of IBM common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

69. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the

damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about IBM's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of IBM and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the IBM common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

70. As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding IBM, their control over, and/or receipt and/or modification of IBM's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

71. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of the personnel at the highest levels of the Company, including the Individual Defendants.

72. The Individual Defendants, because of their positions with IBM, controlled the contents of the Company's public statements during the Class Period. Each defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these defendants is responsible for the accuracy of IBM's corporate statements and is therefore responsible and liable for the representations contained therein.

73. Defendants' scienter is further demonstrated by IBM's recording of the entire $2.4 billion impairment charge on Microelectronics' long-lived assets during the third quarter of 2014, despite ***knowing*** in early 2014 that potential bidders were then deeming such assets to have little, if any, value.

74. Furthermore, the scienter of defendants is underscored by the Sarbanes-Oxley-mandated certifications of defendants Rometty and Schroeter, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about IBM was made known to them and that the Company's disclosure and internal controls were operating effectively.

75. Defendants were further motivated to engage in this course of conduct in order to allow certain Company insiders to collectively sell shares of their personally held IBM common stock for gross proceeds of approximately $23.7 million during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

76. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of IBM common stock and operated as a fraud or deceit on Class Period purchasers of IBM common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of IBM common stock fell precipitously as the prior artificial inflation came out.

77. As a result of their purchases of IBM common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused IBM common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $196.40 per share on July 28, 2014.

78. By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of IBM's business and prospects. When the truth about the Company was revealed to the market, the price of IBM common stock fell precipitously. The decline removed the inflation from the price of IBM common stock, causing real economic loss to investors who had purchased IBM common stock during the Class Period.

79. The decline in the price of IBM common stock after the corrective disclosure came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in IBM common stock negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to

artificially inflate the price of IBM common stock and the subsequent significant decline in the value of IBM common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

80. At all relevant times, the market for IBM common stock was an efficient market for the following reasons, among others:

(a) IBM common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as an SEC registrant, IBM filed periodic public reports with the SEC and the NYSE;

(c) IBM regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) IBM was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

81. As a result of the foregoing, the market for IBM common stock promptly digested current information regarding IBM from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of IBM common stock during the Class Period suffered similar injury through their purchase of IBM common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

82. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of IBM who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

83. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84. During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements

made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

86. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IBM common stock. Plaintiff and the Class would not have purchased IBM common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

87. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of IBM common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act Against the All Defendants

88. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89. The Individual Defendants acted as controlling persons of IBM within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of IBM, and their ownership of IBM common stock, the Individual Defendants had the power and authority to cause IBM to engage in the wrongful conduct complained of herein. IBM controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: March 2, 2015

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp., et al.*, No. 2:13-cv-01159 (E.D. Wis.)

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages)

directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of February, 2015.

CITY OF STERLING HEIGHTS POLICE
& FIRE RETIREMENT SYSTEM

By: [signature]

Its: PRESIDENT

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 08/01/2014 | 1,225 | $189.30 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 07/15/2014 | 1,321 | $189.16 |

*Opening position of 2,910 shares.